UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　Plaintiff,<br>　　v.<br>LIVIA LILL<br>　　　Defendant. | Case No. 13-cr-00448-TEH<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR RELEASE PENDING APPEAL** |

　　　Defendant Livia Lill has filed a motion for release from custody pending an appeal of her conviction and sentencing.  For the reasons articulated below, the Court DENIES Defendant's motion, and ORDERS her self-surrender for service of her sentence on November 12, 2014.

**BACKGROUND**

　　　Livia Lill was arrested February 22, 2013, on a criminal complaint alleging that on February 11-12, 2013, she knowingly and intentionally trafficked in access devices during a one-year period to obtain $1,000 or more. (Docket Nos. 1, 3).  At her bail hearing on March 1, 2013, Lill was released on $75,000 unsecured bond cosigned by two of her friends, with one of them serving as a court-appointed custodian.  She was placed under a curfew and electronic monitoring until her bail review hearing, at which time the Government agreed to remove the curfew and electronic monitoring conditions. (Docket Nos. 10, 16).  To date, her release has been without incident.

　　　On July 9, 2013, Livia Lill was indicted for Conspiracy to Commit Access Device Fraud (Count One), Unlawful Use of Access Devices to Obtain $1,000 or More (Count Two), and Unlawful Possession of Fifteen or More Access Devices (Count Three). (Docket No. 21).  On May 12, 2014, Lill entered a plea agreement with the Government, pleading guilty to Counts Two and Three, and generally waiving her right to appeal her

1  conviction, the judgment, and any aspect of her sentence. (Docket No. 47). Count One
2  was subsequently dismissed by the Government.
3    The Plea Agreement set forth the factual basis for the plea. On February 11, 2013,
4  Lill made three purchases on a fraudulent credit card for merchandise valued at
5  approximately $1,900. During a search of her apartment three days later, law enforcement
6  subsequently recovered additional credit card numbers, which Lill agreed she had used to
7  purchase approximately $21,000 in merchandise. When she was arrested on February 22,
8  she had eleven counterfeit credit cards in her possession. Additionally, the Presentence
9  Report notes that electronic media, receipts, and other items seized from her apartment
10 contained credit card numbers used to fraudulently purchase merchandise from 47
11 different corporate victims, resulting in a total actual loss of $118,160.42. Presentence
12 Report ("PSR"), ¶ 24. Lill's Plea Agreement stipulated to a loss amount of more than
13 $70,000 but less than $120,000, which resulted in an eight-level sentencing enhancement.
14 She also agreed to pay restitution of not less than $118,000.
15   On September 8, 2014, the Court issued a within-guidelines sentence of 18 months'
16 incarceration, in addition to payment of restitution and supervised release. (Docket No.
17 59). After her attorney withdrew, the Court allowed for the appointment of new defense
18 counsel (Docket No. 62), and Lill filed a timely notice of her intent to appeal the judgment
19 and conviction. (Docket No. 66). She filed the present motion for release from custody
20 pending appeal on October 10. (Docket No. 76). Without objection, the Court granted a
21 continuance of her self-surrender date until November 7, so that this motion could be
22 considered. (Docket No. 75). The Government filed a timely Opposition, to which Lill
23 replied on October 27. (Docket Nos. 79, 84).

**LEGAL STANDARD**

26   Motions for bail pending appeal are governed by 18 U.S.C. §§ 3142 and 3143.
27 Where a defendant is convicted and sentenced to prison, she must surrender for service of
28 her sentence unless she shows that: (1) by clear and convincing evidence, she does not

1  pose a flight risk or a danger to the community; (2) the appeal is not for the purpose of
2  delay; and (3) the appeal raises a substantial question of law or fact that is likely to result
3  in reversal, an order for new trial on all counts for which she received a sentence of
4  imprisonment, a sentence of no imprisonment, or a reduced sentence to a term of
5  imprisonment less than the total of the time already served plus the expected duration of
6  the appeal process.  18 U.S.C. § 3143(b); *United States v. Wheeler*, 795 F.2d 839, 840 (9th
7  Cir. 1986).

Under the third prong of this test, the Ninth Circuit has held that "substantial" defines the level of merit required of the question raised on appeal, and "likely to result in reversal" defines the type of question that must be presented. *United States v. Handy*, 761 F.2d 1279, 1280 (9th Cir. 1985).  A "substantial question" is one that is "fairly debatable." *Id.* at 1283.  "Likely to result in reversal" means that "if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial." *Id.*  Thus, the third prong asks whether the error, if it exists, would be harmless. *Id.*

**DISCUSSION**

The Court will first resolve the issues of flight risk and delay before moving to the more substantive question of whether Lill's appeal raises questions of law or fact that are substantial in merit and likely to result in a reversal, an order for a new trial, or a sufficiently reduced sentence.

**I.     Lill does not pose a flight risk or a danger to the community's safety.**

Before granting Lill's release from custody pending her appeal, the Court must find by clear and convincing evidence that she is "not likely to flee or pose a danger to the safety of any other person or the community if released" on bail or under other supervisory conditions.  18 U.S.C. § 3143(b)(1)(A).

The Court finds that Lill has shown by clear and convincing evidence that she is not a flight risk and does not pose a danger to the safety of the community. The Government unconvincingly argues that, while they agreed to allow Lill to remain at large both before and after her sentencing, and even recently allowed her to continue her self-surrender date so that this motion could be heard, she is in fact a flight risk. Opp'n at 2-3 (Docket No. 79). This argument is disingenuous. Lill has surrendered her passport, making international travel exceedingly difficult. Further, just as during the period between her initial bail hearing and bail review hearing, Lill can be equipped with electric monitoring while the appellate court considers her appeal.

While it would be reasonable to believe that Lill poses a greater flight risk after being sentenced to 18 months' imprisonment than she did before the sentencing judgment, the Government's argument that she now poses an undue risk of flight is contradicted by the Government's decision at the sentencing hearing to allow Lill to self-surrender, and again when the Government agreed to allow Lill to continue her self-surrender date so that the Court could consider the present motion. Lill did not flee during the more than year-long pendency of her case, she did not flee in the immediate aftermath of her sentencing, and there is no evidence to suggest that she will flee while she pursues her appeal. Further, the acquiescence of the Government to the lax release conditions up to this date, coupled with Lill's unblemished compliance with her release conditions, provides clear and convincing evidence that she is not a flight risk. Finally, Lill does not have a history of violence that would suggest she poses a risk to the community's safety.

For the foregoing reasons, the Court finds that Lill is not a flight risk and does not pose a danger to the safety of the community.

**II. Lill does not appear to be filing her appeal for the purpose of delay.**

Before granting release, the Court must additionally find that Lill's appeal is not filed for the purpose of delay. 18 U.S.C. § 3143(b)(1)(B).

4

There is no evidence to suggest that Lill's appeal is taken for the purpose of delay. Her purported reason for filing the appeal is to undue the "indelible immigration consequences" that resulted from her conviction for an aggravated felony. Reply at 5 (Docket No. 84); *see* 18 U.S.C. § 1101(a)(43)(G) & (M)(i) (identifying as aggravated felonies theft offenses for which the term of imprisonment is at least one year, and offenses involving fraud or deceit in which the loss to the victim exceeds $10,000). As a result, there is no reason to believe that she gains anything from delaying service of her imprisonment. Lill's conviction will likely result in her deportation, regardless of whether she serves her sentence starting in two weeks or in 18 months.

While the Court ultimately finds that the grounds for Lill's appeal are not "substantial in merit," as will be explained below, the appeal does not itself appear to be taken for the purpose of delay. Instead, Lill appears to be sincerely fighting to secure a sentence that would preserve her immigration status.

**III. Lill's appeal does not raise questions of law or fact that are substantial in merit.**

Finally, in order to secure release from custody pending appeal, Lill's appeal must raise a "substantial question of law or fact." 18 U.S.C. § 3143(b)(1)(B). The term "substantial" defines the level of merit required. *United States v. Handy*, 761 F.2d 1279, 1280, 1283 (9th Cir. 1985). In other words, the question raised on appeal must be one that is "fairly debatable," meaning it must be "of more substance than would be necessary to a finding that it was not frivolous." *Id.* Indeed, it is not enough that the question raised is merely non-frivolous; it must be "a 'close' question or one that very well could be decided the other way." *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985).

On appeal, Lill raises two questions of law or fact. First, she claims that she received ineffective assistance of counsel during the negotiation of her Plea Agreement and during the sentencing hearing. During the negotiation of the Agreement, Lill contends that her previous attorney incorrectly applied the Sentencing Guidelines' "relevant conduct" doctrine when he negotiated the terms of the Agreement to include responsibility

5

1  for $112,000 of loss not directly included in Lill's offenses of conviction. During

2  sentencing, Lill alleges that she received ineffective assistance when her attorney failed to

3  object to the portion of the Court's reasoning that pointed to her speedy "retooling"

4  between the time of the search of her residence and her arrest a week later as evidence of

5  the need for imprisonment to provide proper deterrence. On this point, Lill argues that this

6  alleged retooling is factually inaccurate. Second, Lill claims that the Court failed to

7  properly ask follow-up questions during the change of sentence plea colloquy after noting

8  her hesitation when asked whether she was entering her guilty plea of her own free will.

9  As a result, Lill contends, her plea was not knowing and voluntary.

10      For the following reasons, the Court finds that all of these claims lack "substantial"

11  merit as required to secure Lill's release pending appeal.

### A. Lill's claim that she received ineffective assistance of counsel is without substantial merit.

The Sixth Amendment guarantees all criminal defendants "the right to have the assistance of counsel for his defense." U.S. Const. amend. VI. In order to demonstrate ineffective assistance of counsel, a defendant must first establish that the representation fell "below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Of particular relevance to this motion, the Ninth Circuit has held unreasonable representation to include failure to take advantage of controlling law. *See, e.g., United States v. Palomba*, 31 F.3d 1456 (9th Cir. 1994) (finding failure to move to dismiss counts under the Speedy Trial Act fell below an objective standard of reasonableness). However, review of an attorney's actions is highly deferential, and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690; *see also United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995) ("defendant must surmount the presumption that, under the circumstances, the challenged action might be considered sound trial strategy") (internal quotation marks omitted). Additionally, a defendant who pleads guilty based on the advice of counsel may

6

only attack the voluntary and intelligent character of the guilty plea by showing that "the advice he received from counsel was not within the range of competence demanded of attorneys in criminal cases." *United States v. Jeronimo*, 398 F.3d 1149, 1155 (9th Cir. 2005), *overruled on other grounds by United States v. Jacobo Castillo*, 496 F.3d 947, 957 (9th Cir. 2007) (en banc).

Second, a defendant must demonstrate that there is a "reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Strickland*, 466 U.S. at 694. As it pertains to this motion, the Ninth Circuit has held that the prejudice requirement is met where the legal error increases the defendant's sentence. *See, e.g., Palomba*, 31 F.3d at 1465 ("It is settled that an error that may increase a defendant's sentence is prejudicial.") (citing *United States v. Skillman*, 922 F.2d 1370, 1379 (9th Cir. 1990)).

### 1. Lill's claim that she received ineffective assistance during the negotiation of her Plea Agreement is not fairly debatable.

Lill's first claim on appeal is that her attorney was ineffective in negotiating the terms of her Plea Agreement because he incorrectly applied the "relevant conduct doctrine" when he negotiated a total loss amount that included approximately $112,000 of fraudulent charges that were not *directly* attributed to the two counts to which she pled guilty, increasing the advisory Guidelines range for her sentence from 10-16 months to 18-24 months. Mot. at 11-15. As a result, Lill contends that her attorney's representation fell "below an objective standard of reasonableness" because he did not "take advantage of controlling law," and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Mot. at 11-12. This claim is not "fairly debatable" as required by the release statute and prevailing case law for two reasons. First, the record is insufficiently developed to provide an adequate basis for appellate review on the issue of ineffective assistance of counsel. Second, the evidence actually available in the record supports the attorney's application of

the relevant conduct doctrine in the context of this case, and provides no reason to find that his representation was objectively unreasonable under the exacting *Strickland* standard.

### a. The trial record is insufficiently developed to allow appellate review on the issue of ineffective assistance of counsel.

Ineffective assistance of counsel claims are generally inappropriate on appeal. *United States v. Ross*, 206 F.3d 896, 900 (9th Cir. 2000). "Such claims normally should be raised in habeas corpus proceedings, which permit counsel to develop a record as to what counsel did, why it was done, and what, if any, prejudice resulted." *Id.* (internal quotation marks omitted); *United States v. Quintero-Barraza*, 78 F.3d 1344, 1347 (9th Cir. 1995) ("Ordinarily, a plea of ineffective assistance of counsel should be brought in a collateral proceeding under 28 U.S.C. § 2255 because the appellate record often lacks a sufficient evidentiary basis as to what counsel did, why it was done, and what, if any, prejudice resulted.") (internal quotation marks and citations omitted). However, where the trial record "sets forth facts giving rise to a claim of ineffective assistance of counsel . . . the Court will consider the defendant's argument on direct appeal." *Id.*

The record in this case is devoid of facts indicating what Lill's attorney discussed with her or the Government. There is also not any record of what strategy he was pursuing when he included the $112,000 loss amount under the relevant conduct doctrine, nor any record of the necessary facts indicating the attorney's motives and reasons for advising Lill as he did. Neither this Court nor the appellate court has any information concerning the attorney's view of the strength of the evidence, his consideration of whether additional or more serious charges might have been brought against Lill if she disavowed the higher loss amount, or his thoughts as to whether the Court might find a higher loss amount or other Guidelines enhancements at sentencing if Lill refused to agree to the now disputed loss amount. Furthermore, the Government points out that the record contains only "a small portion of the voluminous evidence produced in discovery." Opp'n at 6 (Docket No. 79). The Ninth Circuit has held that these "factual void[s]" "make[] it impossible . . . to address . . . [a defendant's] ineffective assistance argument adequately on direct review." *United*

8

*States v. Reyes-Platero*, 224 F.3d 1112, 1116 (9th Cir. 2000), *cert. denied*, 531 U.S. 1117 (2001) (citations omitted), *overruled on other grounds by United States v. Jacob Castillo*, 496 F.3d 947, 957 (9th Cir. 2007) (en banc).

This case is readily distinguishable from those which allowed for direct review of ineffective assistance claims. For example, in *United States v. Rivera-Sanchez*, 222 F.3d 1057 (9th Cir. 2000), the appellate court agreed to hear an ineffective assistance claim on direct appeal because the "district court held a hearing, prior to sentencing [the defendant], to examine the question of whether [defense counsel's] representation was ineffective in order to determine whether a downward departure was warranted on that basis." *Id.* at 1060. Both the defendant and his counsel "testified at the hearing regarding [defense counsel's] efforts to communicate the terms of the proposed plea agreement to [the defendant]." *Id.* Here, neither Lill nor her attorney testified regarding his efforts to negotiate the plea agreement, and this Court made no finding as to the quality of the attorney's representation. In fact, the record, and this Court's experience, speaks to the zealous and professional advocacy offered by Lill's attorney throughout this case. Lill's attorney submitted well-articulated and expertly argued sentencing memoranda, and offered a thorough and impassioned plea for departure at the sentencing hearing. The terms of the Plea Agreement also speak to the attorney's strategic efforts, as he negotiated a plea that fell just below the loss amount and number of victim requirements that would have resulted in a much higher Sentencing Guidelines range.

The lack of an adequate record to support an ineffective assistance claim is evidenced by Lill's argument for why her attorney was ineffective in his representation. Lill argues that her attorney "*appears* to have believed that no facts were required" to support the loss enhancement. Mot. at 15 (emphasis added). Lill makes this assumption because the Plea Agreement does not explicitly lay out the facts underlying the application of the relevant conduct doctrine, but she provides no authority that requires a Plea Agreement to do so. In her brief and at oral argument, Lill's claim that her attorney

9

1  misapplied the relevant conduct doctrine essentially relies on two statements made by her

2  attorney to the Court during the sentencing hearing. At that hearing, her attorney stated:

> The information presented by the Government to Probation and to me before that indicated that with respect to Count 2, there was $6,800 loss attributable to my client. This is the unlawful use of the access devices within a period of a year. It was between August of 2012 and February of 2013. And, this is where there were witnesses to the various purchases of items and so forth, using unauthorized credit cards and devices. The remaining 110- or $111,000 is relevant conduct with respect to Count 1. . . . So the defense agreed that legally it's proper for the court to assess restitution based on, on that additional 110- or $111,000, even though they relate to the dismissed count, because the relevant conduct rules. So, my point here is there is a significant amount of restitution that is going to be assessed. With respect to county 2 we have got – which Ms. Lill actually pled guilty to – we have got about $6,800.

11  Ex. F to Levin Decl. at 15-16 (Docket No. 76-5). However, this quote does not

12  provide any indication of why Lill's attorney believed the relevant conduct doctrine

13  applied, on what evidence he predicated this belief, or what he advised his client in this

14  regard. Additionally, Lill's motion does not present this quote in context. Here, Lill's

15  attorney was arguing that Lill "was one of the lowest people on the ladder" of a larger

16  credit card scheme, and that the vast majority of the total loss amount was not the result of

17  purchases personally made by Lill. *Id.* at 16. He was attempting to minimize the gravity

18  of Lill's crimes and her role within the criminal scheme, not explain the legal basis and

19  case strategy behind the application of the relevant conduct rules. Further, his use of the

20  word "restitution" in this context is not incorrect - the restitution amount was based upon

21  the loss amount. Regardless, the use of that word, in isolation or in context, offers no

22  insight into the attorney's thinking or understanding of the law, and ultimately fails to

23  speak to the quality of the legal assistance he rendered in the negotiation of the Plea

24  Agreement.

25  The second quote cited by Lill is similarly taken out of context and fails to provide

26  any insight into the application of the relevant conduct doctrine. At the sentencing

27  hearing, Lill's attorney stated:

10

> So – and as a matter of fact, when those items – the spreadsheets with the amount of loss which eventually became a stipulation – were given to me by the Government, they were given along with an email saying, "I'm producing to you the loss information that we have regarding the card numbers found on the media in Ms. Lill's apartment." And it says, "The loss amount is significant and the spending pattern generally matches what we know about Ms. Lill's habits."

Ex. F to Levin Decl. at 28 (Docket No. 76-5). However, this quote was not in the context of explaining the relevant conduct doctrine or the sentencing enhancement negotiations. Lill's attorney is, instead, making the argument that the approximately $112,000 additional loss amount was not the result of personal charges made by Lill, so the Government's argument that Lill was living a life of "material excess" at the expense of her victims was incorrect. Regardless, as will be explained below, there is nothing legally improper about applying the relevant conduct doctrine to the losses enumerated in these spreadsheets (if that is indeed what the attorney did - the record provides the Court no way of knowing), which included monetary losses related to credit card numbers contained on electronic media seized from Lill's residence and used by the criminal scheme of which she was admittedly a part.

Ultimately, the record is necessarily insufficient for the appellate court to hear an ineffective assistance claim on direct appeal because it "lacks a sufficient evidentiary basis as to what counsel did, why it was done, and what, if any, prejudice resulted." *See Quintero-Barraza*, 78 F.3d at 1347. Consequently, the issue of ineffective assistance during Lill's plea negotiation is not substantial in merit as required by the release statute.

      **b. The available evidence in the record in fact suggests that Lill's attorney correctly applied the relevant conduct doctrine in this case.**

Even if the record were sufficiently developed for an appellate court to review Lill's ineffective assistance claim, her attorney's application of the relevant conduct doctrine appears to have been appropriate, and certainly falls outside the narrow scope of objectively unreasonable representation proscribed by the standard in *Strickland*.

11

In a limited number of circumstances, non-offense conduct can be considered "relevant conduct" sufficient to increase a defendant's Special Offense Characteristics. As it applies to Lill, relevant conduct includes, "(A) all acts and omissions committed, aided, abetted, counseled, induced, procured, or willfully caused by the defendant; and (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction[.]" U.S.S.G. § 1B1.3(a)(1)-(2). In applying the relevant conduct doctrine, "the district court properly consider[s] charged, uncharged, and acquitted conduct by the defendant." *United States v. Peyton*, 353 F.3d 1080, 1089 (9th Cir. 2003), *overruled on other grounds by United States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010).

The record does not establish whether Lill "committed, aided, abetted, counseled, induced, procured, or willfully caused" the $112,000 loss amount as described in § 1B1.3(a)(1)(A) - although, more importantly, it also does not foreclose the possibility. Nonetheless, for the purpose of this analysis, it will be assumed that she did not directly cause the additional loss amount, so the Court turns instead to the application of the second part of this section to determine whether the conduct was a part of the "same course of conduct" or the "same scheme as the offenses of conviction."

The record similarly does not provide sufficient evidence to determine whether the additional loss amount qualifies as relevant conduct under § 1B1.3(a)(1)(B) & (a)(2) for conduct in the context of a jointly undertaken criminal activity that was a part of the "same course of conduct." To find that the conduct was "part of the same course of conduct," there must be a finding of similarity, regularity, or temporal proximity between the charged offense and the potentially relevant conduct. U.S.S.G. § 1B1.3, Application Note 9(B). The record does not provide enough detail regarding the nature of the $112,000 loss amount to determine whether it meets this requirement. However, again, the record also

12

1  does not foreclose the possibility, and so cannot support a finding of ineffective assistance
2  on that basis.
3      More importantly, assuming Lill did not directly cause the additional loss, and the
4  additional loss was not a part of the same "course of conduct" as the offenses of
5  conviction, the available evidence *does* support the argument that it is relevant conduct in
6  the context of a jointly undertaken criminal activity that was a part of the same "common
7  scheme or plan" as the two offenses of conviction. U.S.S.G. § 1B1.3(a)(1)(B) & (a)(2).
8  The Application Notes provide that "for two or more offenses to constitute part of a
9  common scheme or plan, they must be substantially connected to each other by at least one
10 common factor, such as common victims, common purpose or similar *modus operandi*."
11 U.S.S.G. § 1B1.3, Application Note 9(A). On this point, the Court notes that Lill's new
12 attorney appears to conflate the requirements for relevant conduct as a part of the "same
13 course of conduct" with the requirements for relevant conduct as a part of the same
14 "common scheme or plan," as he implored at oral argument that there is no relevant
15 conduct without temporal proximity, which is in fact only a requirement for relevant
16 conduct as a part of the "same course of conduct." Instead, under the standard for relevant
17 conduct as a part of the same "common scheme or plan," there is sufficient evidence for a
18 finding that the additional loss amount and the offenses of conviction were substantially
19 connected by their common purpose and similar *modus operandi*.
20     In the Presentence Report, the additional loss amount is attributed to the electronic
21 media and receipts seized from Lill's residence. See PSR, ¶ 24; Ex. G to Levin Decl.; Ex.
22 1 to Waldinger Decl. The Government had these pieces of evidence forensically analyzed,
23 documented the associated fraudulent losses, and shared the amounts with Lill's attorney
24 and the Probation Officer. Most importantly, these receipts and the electronic media were
25 in the possession of Livia Lill, who was admittedly involved in a fraudulent credit card
26 scheme. *See, e.g.*, Plea Agreement at 4, 6 (Docket No. 47) ("I admit that I possessed all of
27 the counterfeit and unauthorized access devices identified above, and all of the items used
28 to create counterfeit credit cards, with the intent to defraud and in furtherance of a scheme

13

to buy merchandise and other items with stolen credit card information[;]" "I agree to pay restitution for all the losses caused by all the schemes[.]") (emphasis added);  Def.'s Sent. Memo at 2, 7 (Docket No. 51) ("[Lill] was subject to physical and emotional abuse by her boyfriends . . . one of the ringleaders of the credit card scheme with which Ms. Lill is charged . . . . and another of the leaders of the credit card scheme with which Ms. Lill is charged . . . . However, Ms. Lill was plainly not the ringleader of the access device fraud scheme in which she was ensnared, but rather was herself used by the leaders due to her skill as a graphic artist."); *id.* at 8-10 ("Ms. Lill agreed to help them in the credit card fraud scheme . . . . the PSR discusses Ms. Lill's participation in the scheme . . . . numerous other members of the scheme . . . . central roles in the credit card fraud scheme . . . . rather to other participants in the fraud scheme . . . . This is not to say that Ms. Lill was not deeply involved in the scheme over a long period of time.  Clearly she was . . . . leaders of the scheme [ ] often plied Ms. Lill with drugs, rather than pay her for the assistance she provided them with their card making activities, and IDs she assisted them with, and the 'shopping' she did with their counterfeit cards . . . . In fact, Ms. Lill participated in the credit card scheme [with] computers, files, printers, etc., provided to her, or stored at her small apartments, by the leaders of the credit card scheme in order to allow her to assist them with production of identification and credit cards, or which they stored at her apartment or backed up on various electronic storage media that were on computers in her apartment . . . . she played a minor role in the fraud schemes[.]"); *see also* Def.'s Sentencing Reply (Docket No. 54) (using terms such as "conspirators," "scheme," and "participants" to describe the fraudulent credit card ring in which Lill played a role).

      Given the extensive references to one, single fraudulent credit card scheme and Lill's admission in her Sentencing Memorandum that, as part of this scheme, electronic media was given to her by co-participants to be kept in her home in furtherance of her role as the designer of the fraudulent cards, it seems undeniable that the available evidence in the record supports a finding that the additional loss amount found on that electronic media resulted from the same overall scheme as her two offenses of conviction.  Additionally, the

14

1    purpose of the conduct for which Lill pled guilty and the conduct that resulted in the
2    additional loss amount was clearly the same - to defraud people and businesses for the
3    perpetrators' financial gain.  Similarly, the acts share the same *modus operandi* of using
4    fraudulent credit cards and stolen credit card numbers to produce that financial gain.  At
5    the very least, this weight of evidence is sufficient to foreclose any argument that Lill's
6    attorney was so objectively unreasonable in his application of the relevant conduct doctrine
7    that an appellate court would reject the strong presumption that he rendered adequate
8    assistance as required by *Strickland*.

### 2. Lill's claim that she received ineffective assistance during the sentencing hearing is not fairly debatable.

11   Lill additionally argues that her attorney provided ineffective assistance when he
12   failed to object to the Court's statement at sentencing that she had "procured replacement
13   tools" in the time between when her apartment was searched and when she was arrested.
14   Mot. at 15-16.  Lill contends that "the parties had agreed that the credit cards found in Ms.
15   Lill's possession at the time of her arrest on February 22, were the same ones that were
16   used on February 11."  Mot. at 16.  She argues that her attorney's failure to object to the
17   Court's mention of this allegedly erroneous fact amounted to ineffective assistance,
18   because it resulted in the Court's misperception that incarceration was needed to provide a
19   specific deterrence.
20   Lill is correct that the Government and her attorney stated at the change of plea
21   hearing that the February 22 credit cards appeared to be the same as those used by Lill
22   earlier in the month, and were therefore not "new."  However, the record suggests that the
23   attorneys actually misspoke.  In fact, the credit cards discovered during Lill's arrest were
24   different from those she used earlier in the month, as well as those discovered at her
25   residence a week earlier.  *See* Opp'n at 11-13; Exs. 1-4 to Agent Hatherley Decl. (Docket
26   Nos. 81 to 81-4) (demonstrating that the cards discovered at the time of the arrest were not
27   the same as those previously used by Lill or seized by the police).  Because it was
28   supported by evidence, the same point was noted in the Presentence Report, which said

15

Lill "was able to quickly retool after law enforcement's first seizure of the [credit card] manufacturing equipment." PSR, Sent. Rec., at 2. Consequently, had Lill's attorney objected to the Court's statement, he would have actually been wrong.

Regardless, even if the retooling allegation was factually incorrect, which it was not, the attorney's failure to object to the Court's comment was harmless. Lill's "retooling" was only one example of her unwavering commitment to a life of fraudulent conduct. The Court's finding that Lill needed the specific deterrence of imprisonment to move beyond a life of crime was principally supported, as explained at the hearing, by Lill's repeat brushes with the law. She had been arrested on more than one occasion for credit card fraud. Nonetheless, she refused to turn from a life of crime. Further, whether the cards found during her latest arrest were new or not, the fact that she still possessed them provides ample evidence that she had not forsworn the criminal behavior that they represent. Consequently, her attorney's "failure" to object to the statement about retooling had no effect on the Court's sentencing decision. As a result, Lill's appellate claim that her attorney provided ineffective assistance in failing to object to this comment in the Court's reasoning is without substantial merit.

### B. Lill's claim that her guilty plea was not knowing and voluntary is without substantial merit.

Finally, Lill claims that her guilty plea was not knowing and voluntary because when she hesitated during the plea colloquy the Court only asked one follow-up question. Mot. at 16-17. Specifically, the Court initially inquired: "And are you pleading guilty of your own free will because you're in fact, guilty of the offenses that we've been discussing hear today?" To this question, Lill responded, "Yes. Yes." Noting some hesitation, the Court followed-up: "Do I have anything to worry about? You hesitated on that." Lill responded, unequivocally, "No, don't worry about that." Ex. E to Levin Decl. at 10 (Docket No. 76-4).

Lill argues that the Court was obligated to ask even more follow-up questions to ensure Lill was voluntarily pleading guilty. To support this claim, she offers only one out-

of-Circuit case that says courts should ask follow-up "questions" where the defendant's answers indicate the need for clarification. Mot. at 16-17 (citing *United States v. Damon*, 191 F.3d 561, 564 (4th Cir. 1999) (When "a defendant's response to a court's question indicates the need for clarification, follow-up questions must be asked."). The Court did, however, ask a follow-up question, noting her hesitation and asking whether it should be worried. Lill's response to the Court left no room for doubt: "No, don't worry about that." Her hesitation in answering the question is reasonably explained by the fact that Lill was very emotional throughout the proceedings - at times sobbing, gasping, and crying out. Nonetheless, the Court met its obligation to ensure her plea was knowing and voluntary when it asked if it should be worried. Her unambiguous response foreclosed the need for further investigation into her hesitation. Any argument to the contrary borders on the absurd. Surely, the Court is not obligated to talk a defendant out of her guilty plea, but only to ensure that there is no cause for concern.

Moreover, the allegation that Lill's guilty plea was not knowing and voluntary is unsupported by the record. In fact, Lill was strikingly candid when the Court asked her how she pleaded to Count One, saying, "Guilty. I did it." Ex. E to Levin Decl. at 19 (Docket No. 76-4). Additionally, Lill answered the remaining questions of the Rule 11 colloquy without hesitation. Further, nearly four months passed between the entry of her guilty plea and the sentencing hearing. During that entire time, Lill gave no indication that her guilty plea was anything other than voluntary and knowing. It is not "fairly debatable" that an appellate court would now allow Lill to retract her guilty plea because it no longer serves her. A guilty plea entered pursuant to an adequate plea colloquy "should be more than ephemeral," *United States v. Rios Ortiz*, 830 F.2d 1067, 1069, 1070 (9th Cir. 1987), and indulging such a meritless argument serves only to "debas[e] the judicial proceeding at which a defendant pleads." *United States v. Hyde*, 520 U.S. 670, 676 (1977). Consequently, this claim, like the others, is without substantial merit.

**CONCLUSION**

For the foregoing reasons, the Court finds that Lill fails to raise any questions of law or fact that are substantial in merit as required by 18 U.S.C. § 3143. The Court therefore DENIES Defendant's request for release from custody pending appeal.

In order to provide defense counsel an opportunity to appeal this decision, Lill's surrender date is postponed until November 12, 2014.

**IT IS SO ORDERED.**

Dated:   11/06/14                              _____
                                               THELTON E. HENDERSON
                                               United States District Judge